IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROSEMARY CARVER, | ) | Case No. 1:23-cv-1150 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Rosemary Carver, seeks judicial review of the final decision of the

Commissioner of Social Security, partially denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI.  This matter

is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the

Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision

supported by substantial evidence, I recommend that the Commissioner's final decision partially

denying Carver's applications for DIB and SII be affirmed.

## II.    Procedural History

### A.    Initial ALJ Decision

On February 27, 2019, Carver filed an application for DIB.  (Tr. 53, 227).  Carver alleged

an onset date of June 1, 2018, (Tr. 53, 96, 116), and asserted she was disabled due to arthritis,

spinal stenosis, and unsuccessful ankle surgeries, (Tr. 97, 293).  Her application was denied at

the initial level, (Tr. 96-114), and then upon reconsideration, (Tr. 116-133).  On April 3, 2020, a

hearing was held before ALJ Joseph A. Rose.  (Tr. 74-95).  On April 21, 2020, the ALJ issued an

unfavorable decision.  (Tr. 53-68).  Carver requested review of the decision by the Appeals

Council.  (Tr. 219-221).  On December 20, 2020, the Appeals Council denied Carver's request

for review.  (Tr. 35-40).

On February 12, 2021, Carver sought judicial review.  CM/ECF for U.S. Dist. Ct. for

N.D. Ohio, No. 1:21-cv-348, Doc. 1.  On December 14, 2021, Carver and the Commissioner

filed a joint stipulation to remand.  *Id.* Doc. 14.  The same day, the district court issued an order

approving the stipulation, remanding the case to the Commissioner for further proceedings, and

directing the Commissioner to develop the record, offer Carver a new hearing, and issue a new

decision.  *Id.* Doc. 15.

### B.    After Remand – Second ALJ Decision

On January 28, 2022, the Appeals Council issued an order that vacated the ALJ's initial

decision and remanded the action to the ALJ to reevaluate Carver's DIB application, considering

the new evidence that had been submitted concerning Carver's right shoulder injury.  (Tr. 675-

676).  The Appeals Council noted that Carver had additionally filed an application for SSI and

further ordered the ALJ to "consolidate the claims files, associate the evidence, and issue a new

decision on the consolidated claims."  (Tr. 676).  After remand, ALJ Rose held a hearing on July

12, 2022.  (Tr. 601-619).  On August 16, 2022, the ALJ issued a partially favorable decision,

finding first that Carver was not disabled within the meaning of the Social Security Act prior to

October 19, 2019, but that she became disabled on that date and remained disabled through the

date of the decision.  (Tr. 575-591).  On April 19, 2023, the Appeals Council denied Carver's

request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 561-566).  On June 8, 2023, Carver sought judicial review by filing this case.  ECF Doc. 1.

## III.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Carver was born on July 29, 1967 and was 50 years and 10 months old on the alleged

onset date.  (Tr. 644, 655, 734, 741).  Carver graduated from high school, (Tr. 589, 778), and had

past work as a food service director and cook.  (Tr. 589, 768-774, 778).

### B.  Relevant Medical Evidence

#### 1.  Uncontested Evidence Concerning Mental Limitations

Neither party contests the objective medical evidence, Carver's subjective symptom

complaints and testimony, or the opinion evidence, as it relates to Carver's mental limitations;

nor do they contest the ALJ's summary of such record evidence.  *See generally* ECF Doc. 7;

ECF Doc. 9.  Independent review does not reveal any material inconsistencies between the ALJ's

summary of such evidence and the record before this court.  *Compare* (Tr. 584-585, 587-588),

*with* (Tr. 104-106, 110-112, 124-126, 128-131, 446-454, 1022-1031).  Because the parties'

contentions are limited to the physical limitations in the RFC, an independent recitation of

mental limitation evidence in the record is unnecessary and would be duplicative of the extensive

discussion of that evidence in the ALJ's decision.  Consequently, I adopt the following summary

of the mental evidence from the ALJ's decision.[1]

> Finally, the evidence shows that the claimant had depressive disorder ([Tr. 446-454]).  As part of her application for benefits, she was evaluated by consultative examiner Jennifer Haaga, Psy.D., on April 23, 2019 ([Tr. 446-454]).  The claimant complained of feeling depressed "because [her] life was taken from [her]," due to

---

[1] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *3-5 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd by* 139 S. Ct. 1148 (2019); *see also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009).

her physical impairments ([Tr. 450]). She struggled with low mood, anger, social isolation, and excessive worry ([Tr. 450]). The claimant also discussed her "horrible" appetite but denied suicidal ideation and symptoms of agoraphobia ([Tr. 449-450]). Mental status examination notes show irritable mood and congruent affect ([Tr. 449]). Cognitive function tests shows that the claimant could recall 5 digits forward and 4 digits backward ([Tr. 450]). She recalled 2 out of 3 objects after a brief delay but struggled with other general fund of knowledge questions ([Tr. 450]). However, the examiner noted that the claimant's attention and concentration were adequate ([Tr. 451]). She was assessed with adjustment disorder with mixed anxiety and depressed mood ([Tr. 451]). Considering this report, the undersigned finds that the claimant would be limited in her ability to do more than simple tasks, interact with others, and make workplace decisions.

* * *

Similarly, the undersigned is persuaded by the opinions of the State agency psychiatric medical consultants Cynthia Waggoner, Psy.D., and Paul Tangeman, Ph.D. Both Dr. Waggoner, on initial determination, and Dr. Waggoner, on reconsideration, opined that the claimant had moderate limitations in all four areas of the paragraph "B" criteria ([Tr. 96-114, 116-133]). They also opined that the claimant is limited to 1-2 and rare 3-4 step tasks, can maintain adequate concentration to perform such tasks with regular breaks, is limited to superficial encounters with the general public as well as coworkers and supervisors and to low production work in a relaxed setting with minimal routine changes ([Tr. 96-114]; shows that the claimant did not have any mental health treatment. However, the consultative examination showed deficits in fund of knowledge, problems performing cognitive functioning tasks, and complaints of social isolation ([Tr. 446-454]). This would lead to problems in all four areas of the paragraph "B" criteria. They also would result in limitations similar to those Dr. Waggoner and Dr. Tangeman placed in the claimant's mental residual functional capacity. The undersigned has rephrased the mental residual functional capacity using vocational relevant terms and defining the nature of the claimant's interaction with others, but the same limitations Dr. Waggoner and Dr. Tangeman imposed have been reflected in the claimant's mental residual functional capacity.

The undersigned is also persuaded by the opinion of consultative examiner Jennifer Haaga, Psy.D. ([Tr. 446-454]). On April 29, 2019, Dr. Haaga opined that the claimant was capable of comprehending and completing simple, routine tasks but may experience difficulties with understanding, remembering, and following instructions for complex tasks ([Tr. 452]). Dr. Haaga also opined that the claimant would have some difficulty with attention and concentration when the demands became too great ([Tr. 452]). Finally, Dr. Haaga opined that the claimant would struggle with social interactions and work situations where she was uncomfortable or feels like she would not successfully able to complete tasks ([Tr. 453]). This report is the only medical evidence of the claimant's mental functioning prior to the established onset date. The undersigned is persuaded by these findings, as they are

consistent with the claimant's allegations and supported by objective medical findings and an extensive knowledge base of psychiatry.

\*\*\*

Finally, the evidence shows that the claimant still had some mental health symptoms ([Tr. 1022-1031]).  She underwent a second consultative examination as part of her subsequent application for benefits with Herschel Pickholtz, Ed.D. ([Tr. 1022-1031]).  Review of Dr. Pickholtz's report shows that the claimant's persistence fell in the low average range and she struggled with mild to moderate depressive symptoms ([Tr. 1022-1031]).  The claimant's capacity for associative thinking and cognition was between the borderline range to low average range ([Tr. 1022-1031]).  Her memory was judged to be in the low average range, her intellectual functioning was in the borderline to low average range, and her arithmetic computational capacity was in the borderline range ([Tr. 1022-1031]).  She had some problems with abstract thinking, memory, and activities of daily living ([Tr. 1022-1031]).  She was again assessed as having adjustment disorder with depressed mood ([Tr. 1022-1031]).  Considering this report, the undersigned finds that the claimant would continue to be limited in her ability to do more than simple tasks, interact with others, and make workplace decisions.

\* \* \*

The undersigned is persuaded by the opinion of consultative examiner Herschel Pickholtz, Ed.D. ([Tr. 1022-1031]).  On June 8, 2021, Dr. Pickholtz opined that the claimant's ability to understand, remember and carry out simple work activities does not suggest any impairment but her capacity for complex work activities suggest a slight impairment ([Tr. 1022-1031]).  Dr. Pickholtz also opined that the claimant's capacity for 1 – 2 step tasks do not reflect any impairment but her capacity for 3 – 4 step tasks suggest a slight impairment ([Tr. 1022-1031]).  Finally, Dr. Pickholtz opined that the claimant's capacity for social interaction and responding appropriately to work pressures suggest a slight impairment ([Tr. 1022-1031]).  This is consistent with the other consultative examination in the record, which detailed some problems with general information, memory, and cognitive functioning ([Tr. 446-454).  While the undersigned has used different terminology than "slight," the undersigned has interpreted this to mean average or moderate.  Therefore, the undersigned is persuaded by this opinion.

(Tr. 584-585, 587-588).

### 2.  Medical Evidence Concerning Physical Limitations

#### a.  Pre-October 19, 2019 Evidence

5

In February 2014, five months after undergoing ankle fusion surgery, Carver had a CT scan of her right foot and ankle to determine if the surgical hardware needed removal.  (Tr. 380).  The scan demonstrated hindfoot arthrodesis hardware, degenerative change of the foot and ankle without osseous injury, moderate tenderness of the mid to distal supramalleolar into inframalleolar tibialis posterior tendon, and trace ankle joint effusion.  (Tr. 381).  On March 4, 2014, Carver had surgery to remove the right ankle/foot hardware.  (Tr. 374-375).

On April 30, 2018, Carver visited the emergency department, complaining of a fall down the stairs of her deck after her right ankle "gave out."  (Tr. 370-371).  X-rays were taken and analyzed.  (Tr. 365-369).  Joshua Blackmon, M.D., reviewed images of Carver's lumbosacral spine and assessed a mild degenerative disc disease with anterior spurring.  (Tr. 365).  Reviewing images of the cervical spine and chest, Andrew Petraszko, M.D., found no acute cervical spine abnormality and no acute cardiopulmonary process, respectively.  (Tr. 366-367).  Dr. Petraszko found no acute fractures or abnormalities in the left and right knees and found mild tricompartmental osteoarthrosis bilaterally.  (Tr. 368).  Finally, Dr. Petraszko found no acute fractures, misalignment, or abnormalities of the right or left hand.  (Tr. 369).  Robert Zimmerman, M.D., discharged Carver after diagnosing her with osteoarthritis and a knee abrasion, along with hand, knee, low back, and neck pain.  (Tr. 373).

On May 2, 2018, Carver saw John Feighan, M.D., concerning her bilateral knee pain.  (Tr. 400).  An examination demonstrated: (i) morbid obesity; (ii) symmetric alignment of the knees; (iii) bruising on the knees; (iv) 5/5 strength in quads and hamstrings; and (v) good pulses in both legs, no obvious effusion, and no erythema.  (Tr. 400-401).  Dr. Feighan diagnosed bilateral knee pain, primary localized osteoarthritis of knee, and contusion of bone, and recommended physical therapy, ice, anti-inflammatory medication, and bariatric program.

(Tr. 401-402).  Dr. Feighan stated that Carver was "[n]ot a surgical candidate due to body habitus."  (Tr. 402).

On October 22, 2018, Carver saw chiropractor Leonard Lenhart, D.C., during which she complained of acute lumbar pain after lifting an object and stated that homemaking had become difficult when sitting, standing, or walking for more than three minutes.  (Tr. 407).  An examination demonstrated tissue tenderness, pain, and a limited range of motion but found that Carver retained normal gait and balance.  (Tr. 408).  Dr. Lenhart assessed that Carver was of fair health and would make fair progress and recovery, further noting that her recovery may take longer than an average patient due to her issues with obesity and osteoarthritis.  (Tr. 408).

At an October 24, 2018 emergency room visit, Carver complained of back pain.  (Tr. 416).  The attending physician reviewed CT scans of Carver and stated the results were "normal just showing degenerative changes with no acute findings."  (Tr. 417).  Timothy Haaga, M.D., reviewed non-contrast CT exams of Carver's thoracic and lumbar spine and found: (i) no evidence of thoracic or lumbar spine abnormality; (ii) multilevel bilateral mild foraminal stenosis in the mid to lower lumbar spine; and (iii) mild degenerative changes – e.g., minor multilevel disc space narrowing, mild arthritic changes of the sacroiliac joints, and minor atherosclerotic calcification of the iliac arteries.  (Tr. 412-413).  Carver was discharged and advised to return for further evaluation if her symptoms did not improve.  (Tr. 417).

On November 1, 2018, Carver had an appointment with orthopedic surgeon George Kellis, M.D., at which she complained of the same back pain that had originated the prior month.  (Tr. 437-439).  Dr. Kellis found that Carver had weakness in left foot dorsiflexion, diminished sensation in her left thigh, diminished reflexes, and radiculopathy of the lumbar region.  (Tr. 438).  Dr. Kellis ordered an MRI, which showed diffuse degenerative disc disease without

loss of disc height and two disc protrusions.  (Tr. 436, 438).  On November 20, 2018, Dr. Kellis

reviewed the MRI results and determined that it showed: "very mild multilevel degenerative

changes with facet arthropathy at L5-S1 L4-5 and L3-4.  Even L1-2 has facet arthropathy.  There

is no compressive pathology anymore in the lumbar spine." (Tr. 434).  Dr. Kellis assessed

Carver with back pain and recommended physical therapy as the best chance of improvement.

(Tr. 434-435).

### b.        Post-October 19, 2019 Evidence

On October 19, 2019, Carver went to the emergency room after suffering a fall onto her

right shoulder.  She reported that her ankle had given out and complained of pain in her neck,

right shoulder, right forearm, right wrist, and right knee.  (Tr. 513).  CT scans and X-rays did not

initially reveal any acute findings.  (Tr. 525).  Carver was placed in a sling for her right upper

extremity, given medication, and advised to ice the injury and follow up with an orthopedist.

(Tr. 525).

On October 22, 2019, an MRI showed that Carver had a nondisplaced fracture of the

greater tuberosity involving attachment of the supraspinatus, a questionable non-displaced

fracture of the posterior inferior glenoid, a superior labral maceration with additional

anteroinferior labral tear, severe acromioclavicular osteoarthritis, and mild subacromial

subdeltoid bursitis.  (Tr. 482-483).  On December 3, 2019, X-rays of Carver's right shoulder

showed mild osseous deformity of the greater tuberosity, consistent with prior fracture, and mild

osteoarthritis of the right acromioclavicular joint.  (Tr. 481).

On May 6, 2020, Carver saw J. Martin Leland, M.D., to discuss pain in her right shoulder

that had not improved since her October 2019 fall and had worsened after a recent fall in April

2020.  (Tr. 29).  Carver's physical examination demonstrated a limited range of motion in the

right shoulder and chest and biceps tenderness.  (Tr. 31).  Dr. Leland feared significant rotator cuff tearing and ordered a new MRI on Carver's right shoulder.  (Tr. 32).

On May 13, 2020, Carver saw Dr. Leland to go over the MRI results.  (Tr. 24).  Dr. Leland stated that the MRI showed a subacute fracture of the greater tuberosity minimally displaced with partial rotator cuff tearing, biceps tearing, extension labral tearing, impingement, and acromioclavicular joint arthritis.  (Tr. 26).  Dr. Leland recommended, and Carver agreed to, right shoulder surgery.  (Tr. 28).

On June 2, 2020, two weeks after shoulder surgery, Carver saw Dr. Leland and reported that she was doing well, was pleased with her progress, and the pain was well controlled by oral medication.  (Tr. 21-23).  Two months after surgery, Carver reported to Dr. Leland that: (i) she was doing well; but (ii) physical therapy was causing increased pain in her shoulder; and (iii) she had stopped physical therapy but was "doing well with no problems."  (Tr. 18).

On July 14, 2020, during a follow-up appointment with Elizabeth Newsome, PA-C, Carver was prescribed a cane due to her history of recurrent falls and diagnosed with morbid obesity, insomnia, gait instability, vitamin deficiencies, and anxiety/depression.  (Tr. 860-865).  During treatment with Ms. Newsome from mid-2020 to September 12, 2021, Carver was consistently diagnosed with morbid obesity, as well as chronic back, knee, and ankle pain.  *See generally* (Tr. 1073-1128).

On October 13, 2020, Carver had another follow-up with Dr. Leland, who stated that Carver had been progressing well after surgery until she suffered two falls within the prior month.  (Tr. 14).  Dr. Leland prescribed anti-inflammatory medication, gave her a right shoulder subacromial injection to alleviate inflammation, and recommended a restart of physical therapy.  (Tr. 14).

On January 19, 2021, Carver saw Dr. Leland and reported ongoing pain in her shoulder after the surgery.  (Tr. 9).  Carver's physical examination demonstrated a reduced range of motion, tenderness in the AC joint and biceps tenderness, and positive Neers, Hawkins, and Jobes tests with pain and weakness.  (Tr. 12).  Dr. Leland ordered a new MRI.  (Tr. 12).  On January 22, 2021, Dr. Leland discussed the results of the MRI and stated that: (i) they looked "pretty good" and demonstrated no re-tears of the rotator cuff; (ii) he had nothing further to offer the patient; and (iii) he could offer a referral to pain management.  (Tr. 3-8).

### C. Opinion Evidence

#### 1. Dr. Krasnyansky's Disability Evaluation

On May 22, 2019, Inna Krasnyansky, M.D., conducted a consultative disability examination.  (Tr. 460-464).  Carver reported that pain in her: (i) right foot was a 9/10 in intensity and would reach a 10/10 after walking 200 feet; and (ii) back was a constant, sharp 9/10 in intensity that would become dull after walking or standing.  (Tr. 460-461).  Carver's review of systems was positive for leg swelling, back pain, joint pain, myalgias, occasional tingling in both hands, and headaches.  (Tr. 462-363).  Carver's physical examination showed: (i) morbid obesity; (ii) normal gait and coordination; and (iii) reduced range of motion and tenderness in her right ankle and lower back.  (Tr. 463).  Dr. Krasnyansky opined that Carver had: (i) "some limitations in walking/standing due to morbid obesity and [degenerative joint disease of the] lumbar spine[;]" and (ii) "no limitations in carrying, reaching/lifting, hearing or vision[.]"  (Tr. 464).

#### 2. State Agency Medical Consultants

##### a. Before Remand (Pre-October 19, 2019)

On May 29, 2019, for initial review, state agency reviewing medical consultant Michael Lehv, M.D., completed an assessment of Carver's Physical Residual Functional Capacity ("PRFC").  (Tr. 107-109).  Dr. Lehv opined that Carver had the following exertional, postural,

10

and environmental limitations: (i) can lift and/or carry 20 pounds occasionally and 10 pounds

frequently; (ii) can stand, walk, or sit for about 6 hours in an 8-hour workday; (iii) able to

frequently balance; (iv) able to occasionally stoop, kneel, crawl, crouch, and climb ramps, stairs,

ladders, ropes, and scaffolds; and (v) should avoid all exposure to hazards (machinery, heights,

etc.).  (Tr. 108-109).  Dr. Lehv determined that Carver was able to perform work at the light

level of exertion based on her PRFC and found her not disabled, stating:

> You said you were disabled due to arthritis, spinal stenosis and unsuccessful ankle
> surgeries.  Medical evidence shows that you do have physical and emotional
> impairments, which warrant limitations.  However, you are able to use your arms,
> hands and legs in a satisfactory manner.  You are able to act in your own interest
> and are capable of completing your typical daily activities.  We do not have
> sufficient vocational information to determine whether you can perform any of your
> past relevant work.  However, based on the evidence in file, we have determined
> that you can adjust to other work.

(Tr. 113-114).

On August 18, 2019, for the reconsideration level, Steve McKee, M.D., reviewed and

affirmed Dr. Lehv's findings.  (Tr. 126-128, 131-132).

### b.    After Remand (Post-October 19, 2019)

After remand, state agency reviewing medical consultant Mehr Siddiqui, M.D.,

completed a new assessment of Carver's PRFC.  (Tr. 651-652, 662-663).  Dr. Siddiqui opined

that Carver: (i) could lift and/or carry 20 pounds occasionally and 10 pounds frequently; (ii) was

limited beyond lift and/carry in ability to push and/or pull in upper and lower extremities;

(iii) could stand/or walk for a total of 4 hours; and (iv) could sit for about 6 hours in an 8-hour

workday.  (Tr. 651, 662).  For postural limitations, Dr. Siddiqui found that Carver could never

climb ladders, ropes, and scaffolds and could only occasionally stoop, kneel, crawl, crouch, and

climb ramps/stairs.  (Tr. 651, 662).  For manipulative limitations, Dr. Siddiqui found that Carver

had a limited ability to reach overhead, in front, and laterally with her right upper extremity.

11

(Tr. 652, 663).  And for environmental limitations, Dr. Siddiqui found that Carver should avoid all exposure to hazards.  (Tr. 652, 663).  Finally, Dr. Siddiqui determined that Carver was not disabled under the Social Security Act.  (Tr. 654, 665).

### D.  Testimonial Evidence

At the ALJ hearing on remand, Carver testified that her knees and right ankle had issues which impacted her ability to work before the injury to her right shoulder in October 2019, stating that her knees and right ankle would sometimes give out while walking and she would fall.  (Tr. 610-611).  Regarding her right ankle, she testified that she had ankle fusion surgery in 2013 and her ankle has been bad, weak, and painful since the hardware from that surgery was removed.  (Tr. 611).  She testified that her right ankle gave out while descending the stairs to her deck in April 2018.  (Tr. 611-612).  She further testified that she suffered from low back pain and had sought treatment since June 2018.  (Tr. 612).

Carver testified that since her alleged onset date she had had difficulty: (i) climbing stairs; (ii) sitting for long periods of time (only being able to sit for 10 minutes before needing to stand); (iii) bending at the waist; (iv) squatting; (v) kneeling and crawling; and (vi) standing for long periods of time.  (Tr. 613-614).  When standing at her prior job as a chef, she testified that: (i) her foot, knees, and lower back would hurt; and (ii) she was having trouble moving and carrying materials (pots of water, big cans of vegetables).  (Tr. 614-615).

David Martin, a Vocational Expert ("VE"), also testified.  (Tr. 616-618).  The ALJ posed a first hypothetical, asking the VE whether a hypothetical individual could perform any jobs in the national economy at a light exertional level if they possessed Carver's age, education, and work experience and were subject to the following limitations:

> occasional climbing of ramps or stairs; no climbing of ladders, ropes, and scaffolds; frequent balancing; occasional stooping, kneeling, crouching, and crawling; avoid

all exposure to unprotected heights, moving mechanical parts; and no commercial driving; able to perform simple tasks and follow simple instructions; able to have brief and superficial interaction with the general public, occasional interaction with coworkers and supervisors; no responsibility for arbitration, negotiation, or making complex work-related decisions with other coworkers.  There should be few, if any, workplace changes.  And the work tasks should be without strict production quotas, i.e. assembly line work.

(Tr. 617).   The VE testified that such an individual could perform work as a merchandise marker (DOT # 209.587-034), mail clerk (DOT # 209.687-026), and router (DOT # 222.537-038).  (Tr. 617-618).

The ALJ then posed a second hypothetical, asking if the hypothetical person could perform any work in the national economy at a light exertional level if the following additional restrictions were added to the first hypothetical: "this person could not lift or carry more than 10 pounds occasionally with the right upper dominant extremity; also would be limited to standing and walking no more than 2 hours in an 8-hour work day."  (Tr. 618).  The VE testified that the additional limitations would preclude any work at the light exertional level and would limit the hypothetical individual to work at a sedentary exertional level or less.  (Tr. 618).

## IV.    The ALJ's Decision

On August 16, 2022, the ALJ issued a partially favorable decision which found that Carver: (i) was not disabled before October 19, 2019; but (ii) became disabled on October 19, 2019 and maintained that disability through the date of the decision.  (Tr. 575-591).  At Step Four, the ALJ determined that Carver had two residual functional capacities ("RFCs"), one before and the other after October 19, 2019.  (Tr. 582-588).

### A.    Pre-October 19, 2019 RFC

The ALJ determined that, prior to October 19, 2019, Carver had the RFC to perform work at a *light* exertional level, except that she was further limited in the following respects:

13

> [Carver can] occasionally climb ramps, stairs; never climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl; avoid all exposure to unprotected heights, moving mechanical parts, and commercial driving; can follow simple tasks and simple instructions; is able to have brief and superficial interaction with the general public and occasional interaction with coworkers and supervisors; no responsibility for arbitration, negotiation, or making complex work-related decisions with other coworkers; few, if any, workplace changes, and do work tasks without strict production quotas (i.e. assembly line work).

(Tr. 582-586).

In making those findings, the ALJ reviewed Carver's statements concerning the intensity, persistence, and limiting effects of the symptoms from her physical and mental impairments, and she determined that they were inconsistent with the medical evidence in the record.  (Tr. 582-583).  The ALJ considered the following medical evidence in determining the physical limitations in the RFC:

> In regards to the claimant's spine, in April 2018, the claimant sought emergency treatment after sustaining a fall ([Tr. 370]).  She complained of low back pain, as well as pain in her knees, neck and hands ([Tr. 370]).  Physical examination notes show no tenderness to palpation of the lumbar spine, but generalized tenderness to the paravertebral muscles of the lumbar sacral area ([Tr. 371]).  She also had full range of motion ([Tr. 371]).  X-rays of the claimant's lumbar spine showed mild degenerative disc disease with anterior spurring ([Tr. 365]).  She was given a prescription for Norco and discharged with a diagnosis of acute low back pain ([Tr. 373]).

> Six months later, the claimant returned to the emergency room with complaints of back pain after lifting a heavy object ([Tr. 407]).  The claimant described her pain as aching, burning, deep, sharp, stiff, tight and tingling ([Tr. 407]).  Her low back pain ranged down her right leg to her right foot ([Tr. 407]).  Physical examination notes show decreased range of motion without radiation and pain with motion, which was moderate to severe in nature ([Tr. 408]).  She also had normal gait and balance ([Tr. 408]).  A CT scan showed mild degenerative changes and multilevel mild foraminal stenosis in the mid to lower spine ([Tr. 413]).  She was assessed as having lumbar radiculopathy and recommended to use ice to improve her symptoms ([Tr. 408-409]).

> The following month, the claimant sought treatment with an orthopedic specialist ([Tr. 437]).  She reported ongoing significant pain after her October injury ([Tr. 437]).  She stated that she saw a chiropractor a few times in the two weeks

14

since her injury but was not having any relief with her symptoms ([Tr. 437]). Physical examination notes show diminished sensation and reflexes ([Tr. 438]). The claimant also reported some issues with incontinence so her doctor recommended an MRI ([Tr. 437]).  An MRI showed "very mild" multilevel degenerative changes with facet arthropathy at L3-4, L4-5, and L5-S1 ([Tr. 434, 436]).

As part of her application for benefits, she was evaluated by consultative examiner Inna Krasnyansky, M.D., on May 22, 2019 ([Tr. 464]).  While the claimant did not specifically complain of her back pain, she did indicate that some of her back pain causes problems dressing herself and doing household chores ([Tr. 461-462]). Physical examination notes show decreased range of motion of the lumbar spine ([Tr. 463]).  She was assessed as having degenerative joint disease of the lumbar spine ([Tr. 464]).  Considering the objective medical evidence, the undersigned finds that the claimant would be limited in her ability to climb, balance, stoop, kneel, crouch, and crawl.

As for the claimant's right ankle, the evidence shows that the claimant has a history of multiple surgeries on her right ankle ([Tr. 364-393, 459-468]).  The claimant reported a total of 4 surgeries on her right foot, with several of those surgeries involving post-surgical complications ([Tr. 364-393, 459-468]).    [M]edical imagining from early 2014 showed hindfoot arthrodesis, degeneration of the right foot, moderate tendinosis of the mid to distal supramalleolar into inframalleolar tibialis posterior tendon and ankle joint effusion ([Tr. 381]).  Her most recent surgery was on March 5, 2014, when she had the surgical hardware implanted during a previous surgery removed ([Tr. 374]).

As stated above, the claimant was evaluated by consultative examiner Dr. Krasnyansky, M.D., on May 22, 2019 ([Tr. 464]).  She reported constant and significant pain to her right foot ([Tr. 460]). She described it as sharp and burning and rating it as 9 out of 10 normally, with 10 being the most severe ([Tr. 460]). However, the claimant stated that her pain becomes 10 out of 10 after walking just 200 feet ([Tr. 460]).  She estimated that she can only stand for 30 minutes and needs to spend most of the day sitting ([Tr. 460]).  Physical examination notes show decreased range of motion, tenderness and pain with palpation to the Achilles tendon ([Tr. 463]).  She was assessed as being status-post multiple right foot surgeries ([Tr. 464]).  Considering the objective medical evidence, the undersigned finds that the claimant would be limited in her ability to climb, balance, stoop, kneel, crouch, and crawl.

Additionally, the claimant is further limited by her obesity.  As stated above, the undersigned has taken judicial notice regarding the established medical criteria for obesity, as well as the guidelines classifying obesity according to the BMI, which is the ratio of an individual's weight in kilograms to the square of his or her height in meters.  For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 kg/m2 or above as "obesity." (See

15

also Soc. Sec. Rul. 19-2p.).  Review of the record shows that the claimant's BMI was 51.8 ([Tr. 459-468]).  While the undersigned cannot make assumptions about the severity or functional effects of obesity combined with other severe impairments, the undersigned has given consideration to the claimant's body habitus in arriving at the above residual functional capacity in accordance with Social Security Ruling 19-2p.  Specifically, the undersigned finds that she should not work around hazards.

(Tr. 584-585).

The ALJ found that the opinions of state agency medical consultants, Dr. Lehv and Dr. McKee, were persuasive; specifically, their opinions that Carver, before October 19, 2019, could perform light exertional work but was limited in her ability to climb, stop, kneel, crouch, crawl, balance, and to be around workplace hazards.  (Tr. 585).  The ALJ found that the opinions were consistent with the medical evidence, stating:

This evidence shows a history of ankle surgeries with resulting instability and weakness, complaints of low back pain, and a morbidly obese body habitus (Tr. 364-393, 430-439, 459-468]).  These findings would cause some postural and environmental limitations.  Also, her problems with radiating pain and ankle weakness would affect her ability to stand, walk, and lift more than 20 pounds.

(Tr. 585).  The ALJ also found the opinion of Dr. Krasnyansky to be somewhat persuasive, stating:

On May 22, 2019, Dr. Krasnyansky opined that the claimant has some limitations in walking/standing due to morbid obesity and degenerative joint disease of the lumbar spine but no limitations in carrying, reaching/lifting, hearing or vision were identified ([Tr. 464]).  This opinion is vague and imprecise.  Dr. Krasnyansky failed to quantify what "some limitations" in walking and standing entails.  This could be a wide range of limitations, meaning that the claimant was capable of sustained walking and standing for 7 hours in an 8-hour workday or 2 hours in an 8-hour workday.  However, the statement that there are no limitations carrying, reaching/lifting, hearing or vision is consistent with the medical evidence prior to the established onset date.  Review of that evidence shows that the claimant did not sustain an injury to her right shoulder until the established onset date.  Prior to that, there were no issues with reaching or lifting.  After the established onset date, the claimant's shoulder condition deteriorated, causing significant problems reaching and lifting, which will be discussed in more detail below.

(Tr. 585-586).

16

### B.     Post-October 19, 2019 RFC

The ALJ determined that after October 19, 2019, Carver only had the RFC to perform

work at a *sedentary* exertional level and was limited in the same respects as the prior RFC but

with the additional limitation of Carver being unable to lift and/or carry more than 10 pounds

with her right upper extremity.  (Tr. 586-588).  Because Carver has raised no objection regarding

the ALJ's post-October 19, 2019 disability determination, it is unnecessary to more fully address

the ALJ's discussion of that evidence, which is found in the record at: Tr. 586-587.

### C.     Step Five Analysis

At Step Five, the ALJ determined that, prior to October 19, 2019, Carver was able to

perform work in the national economy that existed in significant numbers.  (Tr. 590).  That

finding was based on the VE's testimony that a person with Carver's age, education, work

experience, and pre-October 19, 2019 RFC, could perform light work as a merchandise marker,

mail clerk, and router.  (Tr. 590).  Beginning on October 19, 2019, the ALJ determined that there

were no jobs in the national economy that existed in significant numbers that Carver could

perform.  (Tr. 591).  The ALJ noted that a finding of "disabled" was directed by Medical-

Vocational Rule 201.14.  (Tr. 591).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this

standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance

of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e),

416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

**B.      Step Four: Physical Limitations in the RFC**

Carver argues that the ALJ failed to build a logical bridge between the record evidence and the physical limitations in the pre-October 19, 2019 RFC, specifically the ALJ's determination that Carver had the ability to perform work at a light exertional level, instead of at the sedentary exertional level, because the ALJ: (i) failed to cite or discuss evidence in the record that supported a more restrictive RFC; (ii) used flawed reasoning and did not resolve inconsistences in his analysis; and (iii) improperly evaluated Carver's obesity.  ECF Doc. 7 at 12-22.

### 1.     Whether the ALJ Sufficiently Evaluated the Relevant Evidence

Carver contends that the ALJ did not sufficiently articulate his decision because his evaluation mischaracterized the medical evidence and failed to acknowledge or discuss specific portions of the record that would have supported a more restrictive RFC.  *See* ECF Doc. 7 at 8-15.  The Commissioner disagrees, arguing that the ALJ: (i) adequately paraphrased Carver's medical history; (ii) sufficiently reviewed and discussed the medical record; and (iii) was not required to discuss every piece of evidence.  ECF Doc. 9 at 9.

Carver's argument is unpersuasive.  First, the regulations do not require the ALJ to discuss or cite every piece of evidence.  *See Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Jenkins v. Colvin*, No. 5:15-CV-1165, 2016 U.S. Dist. LEXIS 26105, at *28 (N.D. Ohio Feb. 11, 2016) ("Although an ALJ is required to *consider* all of the evidence in the record, he is not required to *discuss* each item of evidence in [his] opinion." (alternation in original)), *report and recommendation adopted*, No. 5:15-CV-1165, 2016 U.S. Dist. LEXIS 26095 (N.D. Ohio Mar. 1, 2016).  Thus, the ALJ's failure to discuss the specific portions of the record highlighted by Carver does not constitute a reversible error.

Moreover, the ALJ's failure to cite or discuss certain portions of the record does not necessarily mean that the ALJ failed to consider those parts of the record.  For example, Carver argues that the ALJ failed to accommodate or discuss Carver's medical treatment with Dr. Feighan in May 2018.  ECF Doc. 7 at 17 (citing (Tr. 400-402)).  As noted, the ALJ was not required to discuss or cite this evidence.  And Carver has neither argued or demonstrated that Dr.

Feighan's diagnoses (bilateral knee pain, primary localized osteoarthritis of knee, and contusion of bone) and his recommendation of conservative treatment (physical therapy, ice, anti-inflammatory medication, and bariatric program) either contradicted the limitations found in the pre-October 19, 2019 RFC or established a limitation for work at a sedentary exertional level prior to that date. *See* (Tr. 400-402). The same goes for other portions of the record that Carver argues were ignored and not considered by the ALJ.[2] The ALJ's decision stated that he considered "the entire record" and "all symptoms," (Tr. 586); and the decision contained a thorough summary and discussion, supported by extensive record citations, of Carver's subjective symptom complaints, the medical evidence, and opinion evidence at Steps Two through Four. (Tr. 580-586); *see Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)).

Even if we were to credit Carver's arguments, the Commissioner's findings are not subject to reversal merely because there may exist substantial evidence in the record to support a

---

[2] Carver argues that the ALJ failed to address Carver's emergency room visit on October 24, 2018, ECF Doc. 7 at 17, but the ALJ's decision specifically referenced the CT scan results from that visit, (Tr. 583 (citing Tr. 413)). Carver also contends that the ALJ mischaracterized evidence on the record. She alleges that the ALJ stated that Dr. Kellis recommended Carver use ice to improve her symptoms in November 2018, but the record showed that Dr. Kellis never made such a recommendation. ECF Doc. 7 at 16. However, the ALJ never stated that Dr. Kellis made such a recommendation. The ALJ merely stated that Carver "was assessed as having lumbar radiculopathy and recommended to use ice to improve her symptoms" while specifically citing Carver's treatment with Dr. Lenhart on October 22, 2018 – which *did* recommend the use of ice. *See* (Tr. 583 (citing Tr. 408-409)). Carver also points to physical examination notes from October 22, 2018 that demonstrated a "reduced range of motion *with* radiation," while the ALJ stated that this evidence demonstrated a "decreased range of motion without radiation." ECF Doc. 7 at 16. Carver is partially correct. The relevant treatment notes demonstrate that for "[musculoskeletal] – range of motion" of the spine, there was no radiation with respect to general "flexion" and "extension," but there was radiation solely with respect to right lateral flexion. (Tr. 408). There is no indication that this minor error was the key to the ALJ's decision. And there is no reason to think remand to reconsider this point would lead to a different result. Thus, the undersigned finds it to be harmless error.

different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen*, 800 F.2d at 545); *see also His v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."); *O'Brien*, 819 F. App'x at 416.  The substantial evidence standard is a low evidentiary hurdle.  Even if a preponderance of the evidence could support a finding for a more restrictive pre-October 19, 2019 RFC or a limitation to sedentary work, the ALJ's decision cannot be second-guessed when it was reasonably drawn and falls within the Commissioner's "zone of choice."  *O'Brien,* 819 F. App'x at 416; *Jones*, 336 F.3d at 477; *Mullen*, 800 F.2d at 545; *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.").

The ALJ's determination of the physical limitations in the pre-October 19, 2019 RFC, including Carver's ability to perform work at a light exertional level, was supported by substantial evidence.  Such evidence includes: (i) tests and medical imaging demonstrating *mild* degeneration of the lumbar spine; (ii) evidence of normal gait and balance; (iii) opinion evidence stating that there was *some* limitation in Carver's ability to walk/stand and *no* limitations in carrying/reaching/lifting; and (iv) Carver's conservative course of treatment and medication. (Tr. 365-366, 368, 400-402, 408, 412-413, 417, 434-436, 453-464).  Moreover, it is well settled that a state agency consultant's opinion alone may constitute substantial evidence to support an ALJ's RFC determination.  *Hefflin ex rel. LDS v. Kijakazi*, No. 1:20-cv-01414, 2021 U.S. Dist. LEXIS 187647, at *18-20 (N.D. Ohio Sept. 30, 2021) (collecting cases); *Maust v. Colvin*, No. 5:13-cv-02353, 2014 U.S. Dist. LEXIS 137635, at *16-17 (N.D. Ohio Sep. 29, 2014) (same); *see*

*Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 568 (6th Cir. 2009).  Here, the ALJ's

findings regarding the pre-October 19, 2019 RFC are supported by the opinions of the state

agency medical consultants (Dr. Lehv and Dr. McGee), which the ALJ found to be persuasive

and set forth functional limitations nearly identical to those in the pre-October 19, 2019 RFC.

*See* (Tr. 107-112, 126-130, 582, 585).

> ## 2.    Whether the ALJ's pre-October 19, 2019 Analysis was Inconsistent

Carver contends that the ALJ used flawed logic and improperly evaluated the opinions of

the state agency reviewing medical consultants, Dr. Lehv and Dr. McKee.  ECF Doc. 7 at 18-19.

Specifically, she argues that on the one hand, the ALJ found persuasive the medical consultants'

opinions – which clearly supported standing/walking limitations based on the cited evidence of

ankle surgeries, instability, and weakness that affected Carver's ability to stand and walk – but,

on the other hand, failed to adopt any standing or walking limitations in the RFC, which would

have forced a sedentary work limitation.  *Id.*  The Commissioner disagrees, arguing that Carver

overlooked the probative evidence cited by the ALJ that supported the pre-October 19, 2019

RFC (e.g., evidence showing a normal gait) and presented "no authority to support her claim that

her symptoms are 'clearly' consistent with sedentary work only."  ECF Doc. 9 at 10.

The ALJ's rationale for finding Dr. Lehv's and Dr. McKee's opinions persuasive and

then adopting a limitation for light work in the pre-October 19, 2019 RFC was neither illogical

nor inconsistent.  Dr. Lehv and Dr. McKee opined that Carver had the ability to perform work at

a light exertional level with the following limitations: (i) can lift and/or carry 20 pounds

occasionally and 10 pounds frequently; (ii) can stand, walk, or sit for about 6 hours in an 8-hour

workday; (iii) able to frequently balance; (iv) able to occasionally stoop, kneel, crawl, crouch,

and climb ramps, stairs, ladders, ropes, and scaffolds; and (v) should avoid all exposure to

hazards (machinery, heights, etc.).  (Tr. 108-109, 113, 126-128, 131).  The ALJ found these opined limitations to be consistent with Carver's: (i) history of ankle surgeries resulting in instability and weakness; (ii) complaints of lower back pain; and (iii) obesity.  (Tr. 585).  The ALJ also stated that "[Carver's] problems with radiating pain and ankle weakness would affect her ability to stand, walk, and lift more than 20 pounds."  (Tr. 585).

Carver states that the ALJ erred because he provided the above rationale but then failed to adopt any walking or standing limitations in the pre-October 19, 2019 RFC.  ECF Doc. 7 at 18.  However, this is not entirely accurate.  The pre-October 19, 2019 RFC limited Carver to work at a light exertional level with certain postural and environmental limitations.  (Tr. 582).  Social Security Regulations provide that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time."  SSR 83-10, 1983 SSR LEXIS 30 at *14.  Under a plain reading of the definition of light work, there is a possibility that standing/walking could occur for less than 6-hours in an 8-hour workday.  Thus, contrary to Carver's assertion, the ALJ implicitly incorporated some standing and walking limitations in the pre-October 19, 2019 RFC when he determined that Carver was limited to light work.  To the extent that Carver argues the evidence of ankle pain, weakness, and instability necessitates a limitation to sedentary work in the RFC or further limitations in her ability to walk or stand, Carver has not provided authority or explanation to back up this assertion.

Carver also contends that the ALJ's determination of non-disability before October 19, 2019 and the corresponding analysis were flawed because the same evidence and reasoning used by the ALJ to support a sedentary work limitation in the post-October 19, 2019 RFC also supported a sedentary work limitation in the pre-October 19, 2019 RFC as well.  ECF Doc. 7 at

19.  Carver notes that the ALJ cited the following evidence to support the post-October 19, 2019 RFC: (i) her complaints of right ankle weakness that had led the falls; (ii) her seeking treatment for lower back pain and reporting difficulty walking; and (iii) a May 21, 2021 MRI showing minimal disc bulges and mild degenerative changes.  *Id.*  Carver then cites evidence from the record showing that, before October 19, 2019, she had: (i) complained of right ankle weakness; (ii) sought treatment for lower back pain and complained of difficulty walking; and (iii) undergone an MRI that demonstrated disc protrusions and degenerative disc disease.  *Id.*

Carver's argument is unpersuasive.  Although there is some overlap in the evidence used to support the pre- and post-October 19, 2019 RFC findings, the ALJ used other evidence to support the post-October 19, 2019 RFC that was unique and differed from any pre-October 19, 2019 evidence.  To support increased limitations in Carver's ability to climb, balance, stoop, kneel, crouch, and crawl, as well as her ability to stand and walk, the ALJ cited the following additional evidence: (i) a treatment note from May 2021 when Carver complained of left-sided back pain and left flank pain that did not respond to icing, heating, and over-the-counter medication, and prevented her from sleeping or getting into a comfortable position without pain, (Tr. 1017-1018); (ii) the same treatment note demonstrated a significant decrease in Carver's range of motion, (Tr. 1020); and (iii) Carver having been prescribed a cane during follow-up treatment in July 2020, (Tr. 865-866).  (Tr. 587).  There is no record evidence that Carver was prescribed or required the use of a cane before October 19, 2019, and the severity of Carver's pain in the above treatment note appears to exceed any of her complaints prior to October 19, 2019.  These portions of the record demonstrated a worsening of Carver's condition after October 19, 2019 and help explain why the ALJ determined that Carver had the ability to

perform work at a light exertional level before October 19, 2019, before being further limited to work at a sedentary exertional level starting on October 19, 2019.

### 3.      Whether the ALJ Sufficiently Addressed Obesity

Finally, Carver contends that the ALJ did not comply with the guidelines provided under SSR 19-2p when he considered Carver's obesity in relation to the pre-October 19, 2019 RFC. ECF Doc. 7 at 20-22.  Carver appears to argue that the ALJ did not consider her obesity in relation to the exertional limitations (e.g. standing and walking), and he only made a finding as to environmental limitations (e.g. exposure to hazards) in the pre-October 19, 2019 RFC.  *See id.* The Commissioner disagrees, arguing that the ALJ complied with the requirements of SSR 19-2p and noting that Carver did not cite specific evidence demonstrating that her obesity affected her RFC.  ECF Doc. 9 at 10-12.

Although obesity is not a listed impairment, the functional limitations it causes, alone or in combination with other impairments, may medically equal a listing, such as by increasing the severity of a coexisting or related impairment. *See* SSR 19-2p, 2019 SSR LEXIS 2, at *11.  As a result, an ALJ is required to consider the limiting effects of obesity when determining a claimant's RFC.  *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting SSR 19-2p's predecessor "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all states of the sequential evaluation") (citations omitted)).  In particular, SSR 19-2p provides that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment."  *See* SSR 19-2p, 2019 SSR LEXIS 2, at *13.  The regulation also requires an explanation: "As with any other impairment, we will explain how we reached our conclusion on whether obesity causes any limitations."  *Id.* at *12-13.

After reviewing the ALJ's decision, I find that the ALJ complied with the requirements of SSR 19-2p.  After finding obesity to be a severe impairment at Step Two of the sequential evaluation process, (Tr. 578), the ALJ considered Carver's obesity at Step Three and Step Four. At Step Three, the ALJ provided the following detailed analysis:

> To establish obesity as a severe impairment, the undersigned has considered objective medical evidence (signs, laboratory findings, or both) from the medical record. A diagnosis or statement of symptoms does establish a medically determinable impairment, but a calculation of the claimant's Body Mass Index (BMI), which is the ratio of an individual's weight in kilograms to the square of his or her height in meters, over time does.  Generally, for adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 kg/m2 or above as "obesity." (See also Soc. Sec. Rul. 19-2p.).  There needs to be a consistent pattern of obesity, judging by the claimant's weight during the adjudicating period.  To determine the severity of the claimant's obesity, the undersigned has considered evidence from all sources and all documented symptoms, pain, and functional limitations.  No specific BMI establishes obesity as a "severe" or "non-severe" impairment.

> The undersigned has determined the claimant's obesity is a "severe" impairment, thereby finding, as with any other medical condition, this impairment alone or in combination with another medically determinable physical or mental impairment significantly limits an individual's physical or mental ability to do basic work activities.  Although "obesity" has been deleted from the Listing of Impairments in 20 CFR, subpart P, Appendix 1, when obesity is found to be a medically determinable impairment, its effects in evaluating disability must be considered. Specifically, obesity has potential effects in causing or contributing to musculoskeletal, respiratory, cardiovascular, or any other body system impairments.  The combined effects of obesity with those impairments may result in greater effects of each of these impairments and other impairments if only considered separately.

> "Obesity" itself is a risk factor that increases an individual's chances of developing impairments in most body systems.  It commonly leads to, and often complicates, chronic disease of the cardiovascular, respiratory, and musculoskeletal body systems.  However, its effect is not limited to physical impairments, but may also cause or contribute to mental impairments such as depression or subtle changes resulting in loss of mental clarity.  "Obesity" may be a factor in both "meets" and "equals" determinations at Step 3 of the Sequential Evaluation, the listings.  Since there is no longer a specific listing for obesity, a claimant with obesity can only "meet" the requirements of a listing if he or she has another impairment that by itself, meets the requirements of a listing.  However, a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing.

Body habitus, for example, may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  Again, this is especially true of musculoskeletal, respiratory and cardiovascular impairments, but is not limited to these impairments and may impact other coexisting or related impairments.

However, the undersigned cannot make assumptions about the severity or functional effects of obesity combined with other severe impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitation of other impairments, but must be supported on a case-by-case basis on the information in the record.  The undersigned has given consideration to the fact that obesity can cause limitation of function.  An individual may have limitations in any of the exertional functions such as standing, walking, lifting, etc.  It also may affect ability to do postural functions such as climbing, stooping, kneeling or crawling.  The ability to manipulate may be affected by the presence of fatty tissue in the hands and fingers.  The functions likely to be limited depend upon many factors, including where the excess weight is carried.

When evaluating the claimant's obesity as a severe impairment, the undersigned has given consideration to all the foregoing factors during the sequential evaluation at Step 3, Step 4 and Step 5, and has given consideration to Social Security Ruling 19-2p, which supersedes Social Security Ruling 02-1p.

(Tr. 579-580).  The ALJ's decision clearly reflects that he considered the severity of Carver's

obesity after a thorough analysis of the record evidence and after having given consideration to

the applicable guidelines.

At Step Four, the ALJ expressly discussed and considered Carver's obesity, stating:

Additionally, the claimant is further limited by her obesity.  As stated above, the undersigned has taken judicial notice regarding the established medical criteria for obesity, as well as the guidelines classifying obesity according to the BMI, which is the ratio of an individual's weight in kilograms to the square of his or her height in meters.  For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 kg/m2 or above as "obesity."  (See also Soc. Sec. Rul. 19-2p.).  Review of the record shows that the claimant's BMI was 51.8 ([Tr. 459-468]).  While the undersigned cannot make assumptions about the severity or functional effects of obesity combined with other severe impairments, the undersigned has given consideration to the claimant's body habitus in arriving at the above residual functional capacity in accordance with Social Security Ruling 19-2p.  Specifically, the undersigned finds that she should not work around hazards.

28

(Tr. 584).  This analysis reflects that the ALJ considered Carver's obesity in arriving at the physical limitations in the pre-October 19, 2019 RFC, which would include the limitation to light exertional work.  The ALJ further referenced Carver's obesity at the end of his Step Four analysis, stating:

> Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by a consultative examination, physical examination notes showing tenderness to palpation and limited range of motion, and *significantly high BMI calculations*.  However, medical imagining showing "very mild" degeneration of her lumbar spine suggests that the claimant may not have been as limited as she purported prior to her established onset date.

(Tr. 586) (emphasis added).

Although the ALJ could have provided more analysis and discussion about his consideration of Carver's obesity at Step Four, "this court's role is not to ensure that everything that can be said on a topic gets said in an ALJ decision; it is to ensure that what is said is supported by substantial evidence."  *Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 U.S. Dist. LEXIS 244271, at *29 (N.D. Ohio Dec. 22, 2021).  As discussed above, the ALJ's pre-October 19, 2019 RFC is supported by substantial evidence.  Carver faults the ALJ for not providing a more detailed analysis, but the regulations did not mandate an analysis to the level suggested by Carver.  Regardless, Carver has not met her "burden of showing specifically how her obesity, in combination with other impairments, limited her ability to a degree inconsistent with the ALJ's RFC."[3]  *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-01849, 2021 U.S. Dist. LEXIS 208622, at *21 (N.D. Ohio Oct. 6, 2021) (alterations adopted) (quotation marks omitted); *see also Ashley v. Comm'r of Soc. Sec.*, No. 17-11821, 2018 U.S. Dist. LEXIS 164357, at *23

---

[3] The closest that Carver comes to arguing that her obesity, in combination with her other impairments, limited her to a more restrictive RFC, is when she states that the record reflects that she: (i) is obese; (ii) suffers from arthritis in both her knees and her right ankle; and (iii) was not a candidate for surgery due to her obesity.  ECF Doc. 7 at 21-22.  However, this falls short of establishing a more restrictive RFC and error by the ALJ.

(E.D. Mich. Aug. 23, 2018).  And Carver has not pointed to any record evidence demonstrating that Carver's obesity caused functional limitations beyond what the ALJ found.  Accordingly, I find no error in the ALJ's consideration of Carver's obesity.

**VI.    Conclusion**

The ALJ applied the proper legal standards; and his decision reflects that he considered all relevant records and sufficiently considered Carver's impairments, including her obesity. And he cited substantial evidence in support of his decision.  The ALJ also sufficiently explained his decision in a manner which allows us to track his reasoning and understand how he determined the physical limitations in the pre-October 19, 2019 RFC, including his finding that Carver was capable of performing work at a light exertional level before that date.  In other words, the ALJ's decision created the requisite logical bridge between the evidence and the result.  *See Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241.

**VII.   Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Carver's applications for DIB and SSI be affirmed.

Dated: March 5, 2024

Thomas M. Parker
United States Magistrate Judge

---

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.

§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).